**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**August 8, 2018**

# In the Court of Appeals of Georgia

A18A1107. GRAY v. THE STATE.

MCMILLIAN, Judge.

In 2010, Ronald Bernard Gray was indicted on one count of feticide, three counts of family violence aggravated assault, one count of false imprisonment, one count of misdemeanor family violence battery, one count of family violence simple battery, and two counts of cruelty to children in the third degree.[1] Following a jury trial in December 2015, Gray was convicted of one count of family violence aggravated assault, two counts of misdemeanor family violence battery (one count as a lesser-included crime to family violence aggravated assault), one count of false

---

[1] The State re-indicted Gray during the grand jury's September 2014 term for the same offenses, with the indictments differing only as to the language contained in some of the counts. Gray filed a general and special demurrer to that indictment in October 2014, and after the trial court granted the demurrers, the State again re-indicted Gray for the same offenses in December 2014.

imprisonment, and two counts of cruelty to children in the third degree.[2] Gray appeals the denial of his motion for new trial, asserting that the trial court erred in (1) denying his motion to suppress his statements to law enforcement and (2) finding that his constitutional right to a speedy trial was not violated. For the reasons that follow, we affirm.

Viewed in the light most favorable to the jury's verdict,[3] the evidence shows that at the time of the incident, Gray lived with his wife, Latasha McGhee, and her two young children at a boarding house in DeKalb County. On Monday, May 11, 2009, Gray's wife asked Devondra Starks, a fellow boarder, to call an ambulance because her husband had been "beating her up all weekend." Starks saw that McGhee was "very emotional" and had a black eye, a bald spot on her head, a swollen foot, and bruises on her stomach, back, arms, and legs. McGhee, who was seven months pregnant at the time, feared that she had not felt her baby move since Friday.

While the resident was on the phone with 911, Gray returned home, and McGhee ran to her room in fear, and Gray followed. Shortly thereafter, police arrived and escorted Gray outside. One officer went back upstairs with Gray to retrieve his

---

[2] The jury acquitted Gray of the remaining charges.

[3] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

identification, but Gray jumped from a second story window and escaped. After Gray fled, McGhee was taken to the hospital, where she learned that her baby had died and was induced to deliver her stillborn daughter. On May 14, Gray was found in a Stone Mountain apartment hiding in a small cabinet and arrested. He was then interviewed by two DeKalb County police detectives. Gray confessed that he had committed several of the acts for which he was later indicted, including punching his wife in the face and beating her with a belt.

At trial, the State presented the testimony of McGhee, who recounted that over the course of that weekend, Gray repeatedly kicked her and beat her with a variety of objects, including a lamp, phone, belt, and shoes. At one point, McGhee asked him to stop before he hurt their baby, but he told her "I don't give a 'f' about that baby. She is going to be a b*tch just like the rest of you h*'s." Some of the beatings took place while her children watched. The older child, who was 11 years old at the time of trial, testified that he saw Gray hitting his mother and heard his mother crying the day the police came. An audio recording of Gray's confession to hitting his wife was played for the jury, along with the testimony of one of the detectives to whom Gray confessed.

3

1. Although Gray does not challenge the sufficiency of the evidence, we conclude upon review that the evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Gray was guilty of the offenses of which he ultimately was convicted. See *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. In his first enumeration of error, Gray asserts that the trial court erred in failing to suppress his statements under OCGA § 24-8-824 because they were given without a full understanding of his *Miranda* rights and thus were not voluntary.

*Miranda* warnings are intended to preserve a defendant's Fifth Amendment right against self-incrimination and "must be administered to an accused who is in custody and subject to interrogation[.]" *State v. Troutman*, 300 Ga. 616, 617 (1) (797 SE2d 72) (2017). OCGA § 24-8-824 provides "[t]o make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." Statements made to police are deemed to be voluntary, and thus admissible, if the defendant knowingly and intelligently waives his rights under *Miranda*. *Benton v. State*, 302 Ga. 570, 573 (2) (807 SE2d 450) (2017); *Clay v. State*, 290 Ga. 822, 825-26 (1) (725 SE2d 260) (2012). This "waiver must be . . . made with a full awareness of both the nature of the right being

4

abandoned and the consequences of the decision to abandon it." (Citations and punctuation omitted) *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (III) (B) (130 SCt 2250, 176 LE2d 1098) (2010). See also *State v. Floyd*, 306 Ga. App. 402, 405-06 (702 SE2d 467) (2010).

In making this determination, the trial court looks to the totality of circumstances under a preponderance of the evidence standard. *Floyd*, 306 Ga. App. at 405. "On appeal, we accept the trial court's findings of fact and credibility determinations unless they are clearly erroneous . . . [but] independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Norris v. State*, 302 Ga. 802, 804 (II) (809 SE2d 752) (2018). And where there are no disputed facts, such as here when the statement was recorded, "our review of the trial court's application of the law to the undisputed facts is de novo." *Mack v. State*, 296 Ga. 239, 241-42 (765 SE2d 896) (2014). See *Benton*, 302 Ga. at 572 (2) ("where controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo.")

Here, the record shows that the detectives began the interview by handing Gray a printed copy of his *Miranda* rights and reading them aloud. Gray was instructed that he could "decide at any time to exercise these rights and not answer any questions or

5

make any statements." He was then asked if he understood everything that had been read to him, to which he responded, "Yes." One of the detectives also asked Gray if he was "clear on all that," and Gray responded, "Yes." Gray was then asked whether he wanted to continue with the interview, and again he responded, "Yes."

The detectives then asked Gray to initial by each statement of his rights on the printed copy of the *Miranda* form to indicate that he had read and understood each one, and Gray did so. Gray then signed a statement confirming "I have read the above statement of my rights and I understand each of those rights." Finally, Gray was asked to sign under the line that read "[h]aving these rights in mind, I am willing to give up these rights at this time and willingly make a statement." At that point, Gray responded, "Hold up. What you mean give my rights up?" One of the detectives answered that he would be giving his rights up "to make a statement," but that he could "stop at any time" and that "[j]ust cause you sign that doesn't mean . . . you have to answer anything. You're not really giving up any rights . . . you know, just – you talk; you feel like you don't want to talk anymore, you just stop talking. That's – that's your – your right." The detectives then proceeded to interview Gray, and he answered their questions, at no point invoking any of his rights.

Gray argues that his question demonstrates that he did not have the understanding necessary to knowingly and intelligently waive his rights and that the detective's response undermined the entirety of the warnings read and given to him. Because the detective's response that Gray would not be "really giving up any rights" directly contradicted the *Miranda* warnings he had just administered to Gray, and the detective then incompletely paraphrased the right to remain silent, we agree. See *Benton*, 302 Ga. at 573-74 (2) (custodial statement invalid where officer's rephrasing of *Miranda* warnings following defendant's demonstration of lack of understanding was both incomplete and misleading); *Clay v. State*, 290 Ga. 822, 825-26 (1) (A) (2) (725 SE2d 260) (2012) (custodial statement invalid where officer's "super-speed" reading coupled with defendant's drug-induced stupor made any possibility of understanding impossible); *State v. Floyd*, 306 Ga. App. 402, 406 (702 SE2d 467) (2010) (statement invalid where officer read *Miranda* rights too quickly to be reasonably understood and did not ascertain whether defendant understood). Once Gray expressed that he did not understand that he was giving up his rights, it was incumbent on the interrogating officers to take steps to ensure that Gray understood what his rights were and that he would be waiving them by proceeding to make a statement. Here, not only did the officer incompletely describe the rights that Gray

would be waiving but he erroneously told Gray that he would not be giving up any rights. Looking at the totality of the circumstances, we conclude that Gray did not knowingly and intelligently waive his rights under *Miranda*, and the trial court erred in holding otherwise. See *Benton*, 302 Ga. at 573-74 (2).

However, "a violation of *Miranda* is not reversible if it was harmless beyond a reasonable doubt." (Citation and punctuation omitted.) *Benton*, 302 Ga. at 575 (2), n.8. In addition to Gray's statement, the State presented the testimony of McGhee, who identified Gray and detailed the methods and manner in which he violently assaulted her; the son who recounted that he had seen Gray beating his mother; various medical professionals who treated McGhee and described her injuries; the responding officer, who noted both McGhee's appearance and the fact that Gray fled the scene by jumping out of a second-story window in order to avoid arrest;[4] the investigator who discovered Gray hiding after he fled from the boarding house; and photographs documenting McGhee's injuries that matched her description of events. Accordingly, we find the admission of Gray's custodial statement was harmless

---

[4] See *Rush v. State*, 294 Ga. 388, 390 (2) (a) (754 SE2d 63) (2014) (evidence showing a defendant attempted to evade arrest is admissible as circumstantial evidence of guilt); *Michael v. State*, 335 Ga. App. 579, 585 (1) (782 SE2d 479) (2016) (attempt to hide from or elude police constitutes circumstantial evidence of consciousness of guilt).

beyond a reasonable doubt, and this enumeration of error provides no basis for reversal. See *Spears v. State*, 296 Ga. 598, 604 (4) (769 SE2d 337) (2015).

3. In his final enumeration of error, Gray asserts that his constitutional right to a speedy trial was violated. An individual accused of criminal activity is guaranteed the right to a speedy trial by the Sixth Amendment to the United States Constitution and Article I, Section I, Paragraph XI (a) of the Georgia Constitution. See *Brewington v. State*, 288 Ga. 520, 520 (1) (705 SE2d 660) (2011). When considering an accused's motion for discharge and acquittal on the basis of a constitutional speedy trial violation, the trial court must perform a two-stage analysis, pursuant to *Barker v. Wingo*, 407 U.S. 514 (92 SCt 2182, 33 LE2d 101) (1972), and *Doggett v. United States*, 505 U.S. 647 (112 SCt 2686, 120 LE2d 520) (1992). See also *Ruffin v. State*, 284 Ga. 52, 55 (2) (663 SE2d 189) (2008).

(a) In the first stage of this analysis, the trial court must inquire whether the delay from the accused's arrest, indictment, or other formal accusation to the time of trial is so long as to be considered "presumptively prejudicial." *State v. Pickett*, 288 Ga. 674, 675 (2) (a) (706 SE2d 561) (2011). If there has not yet been a trial, "the delay should be calculated from the date of arrest or other formal accusation to the date on which a defendant's speedy trial motion was granted or denied." *State v.*

*Porter*, 288 Ga. 524, 526 (2) (b) (705 SE2d 636) (2011). For serious crimes lacking unusual complexities, "one year generally marks the point at which expected deliberateness in the prosecution of a criminal matter turns into presumptively prejudicial delay." (Citation omitted.) *Ruffin*, 284 Ga. at 55 (2) (a).

Gray was arrested in May 2009. His first motion to dismiss was filed in January 2014 and denied by the trial court in April 2014.[5] Thus, even the time between Gray's arrest and the denial of his first motion is nearly five years, and the trial court properly found that this delay is presumptively prejudicial.[6]

(b) We therefore turn to the next stage of the *Barker* analysis. In this stage, the trial court must:

> engage in a balancing test with the following factors being considered: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) prejudice to the defendant. The existence of no one factor is either necessary or sufficient to sustain a speedy trial claim, and a trial court's findings of fact and its weighing of disputed facts will be afforded deference on appeal.

---

[5] That order was not included in the record.

[6] The trial court initially denied the speedy trial motion by orders dated April 21, 2014 and December 7, 2015 but conducted a fuller *Barker* analysis in its order denying the motion for new trial.

10

(Citations omitted.) *Higgenbottom v. State*, 290 Ga. 198, 200 (1) (719 SE2d 482) (2011). Thus, on appeal we "must accept the ultimate conclusion of the trial court unless it amounts to an abuse of discretion[.]" (Citation omitted.) *State v. Buckner*, 292 Ga. 390, 391 (738 SE2d 65) (2013). However, "[i]f the trial court significantly misapplies the law or clearly errs in a material factual finding," we will only affirm the trial court's decision if we conclude that "had the trial court used the correct facts and legal analysis, it would have had no discretion to reach a different judgment." *Pickett*, 288 Ga. at 679 (2) (d).

(i) *Length of the delay*

While the length of delay acts as the threshold matter for the *Barker* factors, it is "important that trial courts not limit their consideration of the lengthiness of the pretrial delay to the threshold question of presumptive prejudice[.]" *Ruffin*, 284 Ga. at 56-57 (2) (b) (i). Here, the trial court did separately address the length of delay and acknowledged that the time between Gray's arrest in May 2009 and his eventual trial in December 2015 was over six years. However, the trial court did not expressly state how it weighed this factor. Even with the complexities of proving the feticide charge, this is an uncommonly long period of time to prosecute a domestic violence case and should be weighed heavily against the State. See id. at 57 (2) (b) (i) (two year, two

11

months, and twenty three days exceptionally long in noncapital murder case). But, as the trial court noted, the "[m]ere passage of time, standing alone, does not compel a finding of denial of due process." (Citation and punctuation omitted.) *Shuler v. State*, 263 Ga. App. 124, 127 (4) (587 SE2d 269) (2003).

(ii) *Reasons for the delay*

If the State is shown to have deliberately delayed the trial to "hamper the defense," this factor should be "weighted heavily against the government[.]" *Buckner*, 292 Ga. at 394 (3) (b). "[A]n unintentional delay, such as that caused by the mere negligence of the prosecuting attorneys or the overcrowded docket of the trial court, should be weighted less heavily." (Citation and punctuation omitted.) Id. On the other hand, any delay caused by the defendant will be held against the defendant. *Jakupovic v. State*, 287 Ga. 205, 206 (1) (b) (695 SE2d 247) (2010).

After his arrest, Gray posted bond and was released from custody in February 2010. Gray was on trial calendars in June 2011, January 2012, and February 2012, but the trial had to be continued each time. Gray was then placed on the trial calendar for March 2012 but failed to appear in court and remained at large until he was arrested in June 2012 on an unrelated domestic violence offense against a different victim. The trial court found that of the various delays, one was caused by the State's lead

prosecutor being on trial elsewhere, one was due to the trial court's hearing a separate statutory speedy trial case, another was the result of a scheduling issue with Gray's expert witness, and yet another was due to a defense conflict with a date specially set by the Court.

Thus, the trial court properly assessed the reasons for delay as falling partially on both parties, while finding the State's delay was "not engineered . . . with an eye towards gaining a trial advantage." Because the burden for bringing a case to trial rests on the State, who was primarily responsible for the uncommonly long delay in this case, we agree that this factor should be weighed against the State. See *Kemp v. State*, 314 Ga. App. 327, 331-32 (2) (b) (724 SE2d 41) (2012); *Teasley v. State*, 307 Ga. App. 153, 160 (2) (b) (704 SE2d 248) (2010) (when delay can be held against both parties, this factor weighs against party responsible for longest portion of delay).

(iii) *Assertion of the right to speedy trial*

Although an accused is not required to ask for a speedy trial at the first available opportunity, "the accused bears some responsibility to invoke the speedy trial right and put the government on notice that he or she, unlike so many other criminal defendants, would prefer to be tried as soon as possible." *Ruffin*, 284 Ga. at 62 (2) (b) (iii). "The relevant question for purposes of the third *Barker* factor is

13

whether the accused has asserted the right to a speedy trial in due course." (Citation and punctuation omitted) *Id.* at 63 (2) (b) (iii). "And because delay often works to the defendant's advantage, the failure of the accused to assert his right in due course generally is accorded strong evidentiary weight." (Citations and punctuation omitted.) *Buckner*, 292 Ga. at 397 (3) (c).

Gray first asserted his right via motion to dismiss on January 2, 2014, more than four and a half years after his initial arrest.[7] Because Gray did not assert this right in due course, the trial court did not abuse its discretion in weighing this consideration against him. See *Buckner*, 292 Ga. at 397 (3) (c) (defendant's nearly four year delay in asserting his right properly weighed heavily against him); *Ruffin*, 284 Ga. at 63-64 (2) (b) (iii) (where defendant waited a year and a half to assert the right, this factor is properly weighed against him).

(iv) *Prejudice to the defendant*

This factor is "assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Buckner*, 292 Ga. at 398 (3) (d). Specifically, we look to three types of prejudice caused by an excessive delay:

---

[7] Although Gray filed a pro se speedy trial demand on June 13, 2013 (more than four years after his arrest), this demand had no effect as he was represented by counsel. See *Thomas v. State*, 331 Ga. App. 641, 644 (771 SE2d 255) (2015).

14

"oppressive pretrial detention; anxiety and concern of the accused; and the possibility that the accused's defense will be impaired." *Kemp*, 314 Ga. App. at 333 (2) (d). Of these types, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (Citation and punctuation omitted.) *Doggett*, 505 U.S. at 654 (III) (A). "[O]nce the threshold presumptive prejudice is satisfied, a presumption of prejudice always exists, although it increases in weight over time." (Citation omitted.) *Porter*, 288 Ga. at 531 (2) (c) (4).

While Gray's pre-trial incarceration was substantial, he has "failed to establish the type of oppressive pretrial incarceration or anxiety and concern beyond that which necessarily attend confinement in a penal institution." (Citation and punctuation omitted.) *Harris v. State*, 284 Ga. 455, 456 (667 SE2d 361) (2008) (delay of five and one-half years between arrest and motion to dismiss hearing is significant). With respect to the final type of prejudice, Gray argues that the delay injured his defense because of the clouding it inevitably had on the memories of the witnesses and his inability to track down his ex-girlfriend, Erika Terry, to testify on his behalf as a character witness.

15

We first note that the "mere assertions that memories have faded over time" are insufficient to establish prejudice. *Stewart v. State*, 310 Ga. App. 551, 560 (2) (d) (iii) (713 SE2d 708) (2011). Moreover, with respect to Gray's specific claims regarding diminished memory, each of the witnesses he complained of were witnesses called by the State *against* him. Thus, as the State notes, the loss of memory caused by the delay was as likely to aid Gray's defense as prejudice it. See *Jakupovic*, 287 Ga. 207 (1) (d). For example, though one child witness testified that Gray hit his mother, the child was unable to identify Gray in the courtroom.

Turning to Gray's claim that he is now unable to locate a character witness, we have explained that in order to carry the burden of showing "prejudice due to the unavailability of a witness, [the defendant] must show that the missing witness could supply material evidence for the defense." *Ellis v. State*, 343 Ga. App. 391, 400 (4) (d) (806 SE2d 839) (2017). At the new trial hearing, Gray argued that he was unable to locate Terry, the mother of his other children. According to Gray, part of the argument leading to the incident he was arrested for was regarding whether or not McGhee had been contacting Terry on his cell phone. Gray claims he would have been able to use Terry's testimony that McGhee was contacting her to establish motive for why she called the police on him. However, at trial, McGhee testified that

16

she was aware of Terry and that she had gotten back in touch with Gray and was making plans for Gray to see his sons. She also admitted to contacting Terry via Gray's email account. Thus, the trial court did not err in finding that Gray failed to establish that Terry's testimony would have supplied material evidence for his defense. See *Miller v. State*, 313 Ga. App. 552, 556 (2) (722 SE2d 152) (2012).

(v) *Balancing the Barker factors*[8]

Although the trial court neglected to expressly assign a weight to the first *Barker* factor, we need not remand this case because, based on the record before us, had the trial court used the correct legal analysis, it would have had no discretion to reach a different judgment. See *Leopold v. State*, 333 Ga. App. 777, 784 (2) (e) (777 SE2d 254) (2015). Although the length of the delay was substantial, and the State was primarily responsible for most of the delay, those relatively benign considerations are outweighed by the fact that Gray waited for four and one half years before asserting his right to a speedy trial and that he has not shown that he has been prejudiced by the delay. See *Dillard v. State*, 297 Ga. 756, 763 (4) (778 SE2d 184) (2015) ("delayed assertion of the right to a speedy trial and lack of prejudice are the two factors that

---

[8] Although the trial court did not expressly balance the *Barker* factors in its order denying the motion for new trial, it did so in its December 7, 2015 order denying the speedy trial motion.

17

most often weigh heavily against defendants and which then support the overall conclusion that speedy trial rights have not been violated") (citation and punctuation omitted); *Sweatman v. State*, 287 Ga. 872, 876 (6) (700 SE2d 579) (2010) (although nearly five-year delay weighed against the State, no abuse of discretion in denying motion to dismiss because the State did not deliberately cause delay, defendant waited ten months after indictment and until eve of trial to assert her right, and there was no demonstrable prejudice to her defense); *Harris v. State*, 284 Ga. 455, 457 (667 SE2d 361) (2008) (defendant could not prevail on speedy trial claim where, balancing all *Barker* factors, presumptive prejudice was outweighed by other considerations, particularly his lengthy delay in asserting the right and absence of demonstrable prejudice to his defense). Accordingly, we find no abuse of discretion and affirm the trial court's denial of the speedy trial motion.

*Judgment affirmed. Barnes, P. J., and Reese, J., concur.*